**In re Anonymous No. 77 D.B. 93**

Disciplinary Board Docket no. 77 D.B. 93.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SALTZ, *Member,* February 21, 1996—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

A petition for discipline was filed against respondent on September 10, 1993. The petition alleged that respondent engaged in professional misconduct in violation of specified Rules of Professional Conduct and Disciplinary Rules arising from his action in three separate cases. Petitioner also alleged that respondent violated Rules of Professional Conduct by engaging in

a pattern of financial misdealings. Respondent did not file an answer within the prescribed time.

This matter was referred to Hearing Committee [　] comprised of Chairperson [　], Esquire, and members [　], Esquire and [　], Esquire. A pre-hearing conference was held on June 7, 1994 at which a stipulation was entered regarding the facts of this matter. A hearing was held on June 9, 1994. Respondent was represented by [　], Esquire. Petitioner was represented by [　], Esquire. The committee issued its report on April 6, 1995 and recommended a four-month suspension and a public reprimand at the end of the suspension. Petitioner filed a brief on exceptions on April 25, 1995 to which respondent filed a brief opposing exceptions on June 12, 1995. Petitioner filed a motion to strike respondent's brief due to the untimeliness of the filing. The Disciplinary Board issued an order on July 19, 1995 accepting the motion as part of the record.

This matter was adjudicated by the Disciplinary Board at the meeting of August 17, 1995.

## II. FINDINGS OF FACT

The board adopts the following findings of fact as stipulated to by petitioner and respondent:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was born on November 11, 1952, and was admitted to practice law in the Commonwealth of Pennsylvania on or about November 16, 1979. His office is located at [    ]. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

*Charge I: The [A] Matter*

(3) In June 1985, respondent was retained by [    ] and [    ] [A] to assume representation of their son [B] in a personal injury suit which had been filed in July 1979, in the [    ] Court of Common Pleas, against [C] and [D], arising from an accident which took place in September 1977, at which time [B] was a minor. (Ex. P-3.)

(4) At that time, respondent maintained an office at [    ].

(5) The [A] had initially retained [E], Esquire, to represent [B] and themselves in the case.

(a) Prior to respondent's retention, [E] had conducted some discovery and filed a certificate of readiness for a jury trial. (Ex. P-3.)

(b) In June 1985, respondent and the [A] notified [E] of respondent's representation of the [A] and requested the file.

(c) Thereafter, respondent and [E] corresponded concerning transfer of the file, culminating in a letter from [E's] office dated August 13, 1985 (Ex. P-4) and a letter from respondent dated August 20, 1985. (Ex. P-5.)

(6) In December 1985, after a favorable jury verdict, respondent entered into a settlement with defendants for $60,000.

(7) On January 17, 1986, the defendants, insurance company, [F], issued a settlement check in the amount

of $60,000, payable to respondent and the [A], which respondent deposited into his escrow account. (Exs. P-6, P-7.)

(8) Respondent drafted a handwritten document captioned "[B] Distribution" (Ex. P-8), wherein he listed receipts and distributions as follows:

| | | |
|---|---|---|
| SETTLEMENT | | $60,000.00 |
| LESS LITIGATION COSTS: | | |
| [itemized [E] costs] | $585.05 | |
| [itemized [Respondent] costs] | 944.00 | - 1,529.05 |
| BALANCE | | $58,471.00 [sic] |
| LESS LEGAL FEE (15 percent) | | - 8,770.65 |
| BALANCE | | $49,700.35 |
| LESS LOAN TO CLIENT | | - 1,461.77 |
| NET TO CLIENT | | $48,238.58 |

(9) Mrs. [A] signed the distribution schedule, which was left undated. (Ex. P-8.)

(10) On January 27, 1986, respondent drew checks on the escrow account and disbursed the proceeds of the [A] settlement as follows:

(a) check no. 216, in the amount of $8,770.65, payable to himself; (Ex. P-9)

(b) check no. 217, in the amount of $1,529, payable to himself, annotated for "costs"; (Ex. P-10) and

(c) check no. 218, in the amount of $48,232.58, payable to [A] and [B], annotated "full settlement." (Ex. P-11.)

(11) Respondent did not reveal the fact of the settlement to [E].

(12) Respondent failed to distribute to [E] any portion of the $8,770.65 in January 1986.

(13) On January 27, 1986, Mrs. [A] negotiated check no. 218, at [G] Bank, at which time the back of the check was annotated "cash 401268 $10,719; deposit $37,513.58." (Ex. P-11.)

(a) Mrs. [A] deposited $37,513.58 of the proceeds of check no. 218 into the [A's] personal account and obtained cashier's check no. 401268, in the amount of $10,719, payable to herself. (Ex. P-12.)

(b) Mrs. [A] then delivered [G] Bank cashier's check no. 401268 to respondent, who used it for payment towards settlement of purchase of certain real estate. (Ex. P-12.)

(c) As a result of receiving the $10,719 cashier's check, respondent received a total of $19,489.65 from the [A], which is equal to one-third of the net recovery in the [A] case, after deduction of the $1,529.05 in costs paid to respondent.

(14) Respondent did not distribute to [E] any portion of the additional funds received.

(15) On January 30, 1986, respondent utilized the $10,719 cashier's check as part payment in closing of his purchase of real property located at [   ], by signing his name on the back of the check below the endorsement "pay to the order of [H] Title Insurance Company." (Exs. P-12, P-13.)

(16) In or about July 1986, respondent moved his law office to the [   ].

(17) In November 1986, [E] learned that the case had been settled, after which:

(a) He wrote to and telephoned respondent inquiring as to when he could expect payment of his fee. (Ex. P-14.)

(b) [E] wrote a letter dated March 31, 1987, sent by certified mail and received by respondent on April

1, 1987 (Exs. P-15, P-15A), advising of his knowledge that the case had been settled, requesting financial documentation, and demanding payment of his fee.

(c) Respondent sent to [E] his escrow account check no. 162, dated April 9, 1987, in the amount of $1,949.03, payable to [E], annotated "referral fee for [B]." (Ex. P-16.)

(d) [E] did not negotiate the check, instead writing to respondent by letter dated April 14, 1987, again pointing out the actual amount of the settlement, requesting documents relating to the distribution, claiming larger fees, and requesting a prompt response. (Ex. P-17.)

(e) Respondent did not respond to that letter or to subsequent telephone calls from [E], nor did he provide the information and documentation requested by him.

(18) In or prior to 1987, respondent moved his office from the [    ].

(19) On July 15, 1987, [E] filed suit against respondent to collect his fee in the [A] case, and respondent was served on August 6, 1987. (Exs. P-18, P-19.)

(20) On August 31, 1987, respondent filed his answer, new matter, containing a counterclaim, which he personally verified (Ex. P-20), in which, inter alia:

(a) he alleged that he had sent [E] a check in the amount of $2,000, that the $2,000 represented one-third of the fee received by respondent, and that the fee was 15 percent; and

(b) he claimed that [E's] "actions are willful and malicious without cause or substantiation."

(21) Thereafter, [E] engaged in discovery efforts in which he demanded that respondent produce all records relating to the [A] transactions. (Exs. P-21, P-22.)

(22) Respondent eventually complied with certain of the discovery requests, but did not release a copy

of the power of attorney setting forth respondent's fee agreement with the [A] as requested, because no written agreement existed at the time.

(23) By letter dated September 28, 1987 (Ex. P-23), respondent advised [E] that he was forwarding documents, including the power of attorney, but he did not include that document, which did not exist at that time.

(24) In December 1987, [E] obtained an order compelling production of documents. (Exs. P-24, P-25.)

(25) Respondent then prepared and transmitted to [E] a power of attorney (Ex. P-26), which:

(a) was drawn on letterhead showing his office location at [    ], when in fact his offices were located at [    ], at the time he was retained, and at the [    ] on the date the power was prepared; and

(b) stated that respondent: "shall retain or be entitled to 15 percent of the gross amount to be received if litigation has not been commenced by way of the filing of a summons or complaint, or *xxxx* percent of the gross amount to be received after such litigation has already been commenced";

(c) and had been executed but not dated by [B].

(26) On March 23, 1988, an arbitration hearing was held at the [    ] Court of Common Pleas Arbitration Center (S-26), at which time the following evidence was presented:

(a) In his opening statement, respondent stated that he had received a 15 percent contingent fee in the [A] case, of which he had sent [E] one-third; and that he had sent checks to [E] evidencing the amount of counsel fees he had received. (Ex. P-27, p. 3.)

(b) During cross-examination respondent testified that:

(i) because he had a long-standing personal relationship with the [A], he did not enter into a written fee agreement with them at the time of the initial retention; (Ex. P-27; pp. 6-8)

(ii) in July 1985, the [A] orally agreed to a 15 percent contingent fee; *(Id.)*

(iii) he received only $8,770.65 in legal fees; (Ex. P-27, p. 20)

(iv) the [A] received $48,232.58 as their share of the settlement funds; (Ex. P-27, p. 10) and

(v) after [E] had filed the motion to compel discovery, he had prepared the power of attorney and sent it to [A] for [C] execution. (Ex. P-27, p. 7.)

(c) Respondent called a witness, [A], who testified inter alia, that there was no written fee agreement between respondent and the [A], but that he had agreed to represent them for a "minimal" fee, "approximately 15 percent." (Ex. P-27, p. 33.)

(d) Respondent stated in closing argument that:

(i) he had been willing to pay [E] $3,000 as his one-third of respondent's 15 percent fee; (Ex. P-27, p. 36)

(ii) he could not remember, quite honestly, what that $10,000 [sic] notation was for on the back of the check; *(Id.)*

(iii) he thought that the [B] was buying a house at the time that distribution was made to them; *(Id.)* and

(iv) he did not receive the $10,719 cashier's check, as demonstrated by the endorsement "deposit into [H]," after his name. (Ex. P-27, p. 37).

(27) A true and correct copy of the notes of testimony of that proceeding is ex. P-27.

(28) The arbitrators entered a report and award in favor of [E] and against respondent in the amount of $6,496.55 plus counsel fees and costs in the amount of $1,722.50, for a total of $8,219.05. (Ex. P-28.)

(29) Respondent and [E] eventually settled the case for $7,750, which was paid in June 1989. (Ex. P-29.)

## Charge II: The [I] Matter

(30) In August 1984, respondent was retained by [I] to represent her and her minor son, [J], with respect to claims arising when [J] was struck by an automobile on August 7, 1984.

(31) Respondent agreed to represent [I] for a one-third contingent fee.

(32) On April 15, 1985, respondent filed a suit captioned *[J], a minor, by his parent and natural guardian, [I], and [I], in her own right v. [K],* [    ] Court of Common Pleas, April Term 1985 no. [    ], which raised independent claims for each party. (Exs. P-34, P-35.)

(33) On July 18, 1985, counsel for [K] filed a pleading captioned "answer and new matter and new matter under Pa.R.C.P. 2252(d) joining [I]" as an additional defendant, which alleged her contributory negligence. (Ex. P-36.)

(34) On July 30, 1985, a document purporting to be the entry of appearance of [L], Esquire, and a pleading captioned "additional defendant's reply to defendant's answer and new matter," were filed with the prothonotary, both of which documents utilized [L's] caption

paper and bore signatures purporting to be his. (Exs. P-37, P-38.)

(35) On December 18, 1985, the matter went to arbitration, at which time:

(a) respondent appeared for [J] and [I];

(b) the panel entered its report and award in favor of [J] against [K], in the amount of $7,500, plus $500 in delay damages; and against [I] as plaintiff. (Ex. P-39.)

(36) On January 10, 1986, respondent and an adjuster for [M] Insurance Company, the defendant's insurer, agreed to settle the case for $6,000, with the client's approval.

(37) Respondent failed to obtain court approval for the settlement prior to agreeing to it.

(38) On January 10, 1986, [M] issued a draft in the amount of $6,000 payable to "[I] as parent and natural guardian of [J] & [respondent] their attorney" and transmitted it to respondent. (Ex. P-40.)

(39) On or about January 16, 1985, respondent endorsed the draft and deposited it into his attorney escrow account at [N] Bank. (Ex. P-41.)

(40) Respondent then issued a check on the escrow account, in the amount of $2,400, payable to himself, as his fee in the [I] case. (Ex. P-42.)

(41) Under cover of a message-reply dated January 20, 1986 (Ex. P-43), respondent forwarded to [M] a "parents' release and indemnity agreement," dated January 20, 1986 (Ex. P-44), which bore a signature in the name of [I].

(42) On January 29, 1986, respondent filed in motion court a petition for leave to compromise minor's action

and a proposed order (Exs. P-45, P-46), in which he proposed the following distribution:

TO [respondent]—Reimbursement of costs    $   184.00

TO [respondent]—Attorney fees         $1,938.66

TO [I], in trust in a federally insured savings account or certificate for [J], a minor, marked "not to be withdrawn until said minor reaches the age of 18 or upon further order of the court."        $3,877.34

TOTAL        $6,000.00

(43) In his petition, respondent failed to reveal to the court that he had:

(a) already accepted the settlement and provided a release to [M]; and

(b) already withdrawn his legal fee, which was in excess of that set forth in the proposed order.

(44) On February 6, 1986, the Honorable [O] signed the order which respondent had proposed, approving settlement in the amount of $6,000 and directing him to make distribution as set forth therein. (Ex. P-46.)

(45) Respondent failed to provide [I] a copy of the February 6, 1986 order.

(46) On February 13, 1986, respondent met with [I], at which time:

(a) he advised her that he would make distribution to her of the settlement proceeds;

(b) after discussion with [I] concerning money to buy clothing for her son, respondent agreed to release part of the settlement to her; and

(c) he issued two checks on his escrow account:

(i) check no. 233, in the amount of $700, payable to [I] and [J] (Ex. P-47), which he gave to her; and

(ii) check no. 234, payable to [J], in the amount of $2,696 (Ex. P-48), which respondent used to purchase an 84-month certificate of deposit at [N] Bank in the name "[J]," which was not marked for restricted withdrawal. (Exs. P-49, P-50.)

(47) Respondent distributed a total of $3,396, rather than $3,877.34, for the benefit of [J].

(48) On June 19, 1987, [J], then age 12, was arrested and charged as a juvenile with attempted rape, indecent exposure, indecent assault, conspiracy, and unlawful restraint.

(49) Shortly thereafter, [I] requested that respondent represent [J] in the juvenile matters, which he agreed to do.

(50) On April 8, 1988, the case was dismissed after a demurrer by defendant.

(51) In December 1989, respondent was placed on notice that he was under investigation by petitioner for transactions relating to his handling of settlement funds in the [A] matter, and was asked to produce records of financial transactions for a period including the month of January 1986, which included the transactions involving the receipt of the [I] settlement and withdrawal of the $2,400 fee therefrom. (Ex. P-1.)

(52) Respondent had no contact with [I] from April 1988 until January 17, 1990, when he sent a letter (Ex. P-51) in which he forwarded a document entitled "distribution of [J]" (Ex. P-52), wherein he listed receipts and distributions as follows:

| | |
|---|---|
| Settlement | $6,000.00 |
| [Itemized] costs [totalling] | $ 204.00 |
| | $5,796.00 |
| One-third fee | $1,932.00 |
| | $3,864.00 |
| Additional criminal fee for minor (D/I: 6/19/87) | $ 468.00 |
| Net to client | $3,396.00 |

(a) advised that he had revised the distribution sheet concerning her son's case and had enclosed the new sheet so that she could sign it and return it to him;

(b) represented that "pursuant to our agreement," he had reduced his original fee for representing [J] in his juvenile matter to $468 and had deducted the same from the "accident case" as indicated in the "revised distribution sheet"; and

(c) requested that she sign and return his cover letter as well.

(53) After receiving the January 17, 1990 letter, [I] called respondent, at which time she asked for an explanation of the financial transactions between respondent and herself.

(54) In January 1990, petitioner continued its investigation of respondent, in which it sought, inter alia, his check stubs, deposit records, and ledger or other document relating to transactions in his escrow account, but respondent did not produce the records at that time. (Exs. P-53, P-54.)

(55) In February 1990, respondent corresponded with [I] in an effort to obtain her signature on the revised distribution sheet (Exs. P-55, P-56), in the course of which:

(a) [I] requested that respondent produce certain records relating to the case and the financial transactions, including his bank records, to demonstrate how the funds had been handled. (Ex. P-57.)

(b) respondent provided certain records to [I]. (Exs. P-58A, P-58B.)

(56) In February or March 1990, respondent met with [I], at which time he:

(a) provided a client ledger sheet; (Ex. P-59)

(b) stated that he had made a mistake in the distribution;

(i) obtained her signature on a handwritten "distribution" sheet which was inconsistent with the court's order; (Ex. P-60) and

(c) gave her a check in the amount of $468 annotated "refund of criminal fee." (Ex. P-61.)

(57) On June 15, 1990 respondent provided certain of the records requested by petitioner in its investigatory proceedings (Ex. P-62), and he provided the remaining records in June 1992.

(58) Petitioner examined thousands of checks over a six-year period of time from respondent's high volume personal injury practice.

(59) Full analysis of the records does not demonstrate any pattern of financial misdealings.

## III. CONCLUSIONS OF LAW

Respondent's aforementioned conduct in the [A] matter violated the following Disciplinary Rules:

(1) D.R. 1-102(A)(2)—a lawyer shall not circumvent a Disciplinary Rule through actions of another;

(2) D.R. 1-102(A)(3)—a lawyer shall not engage in illegal conduct involving moral turpitude;

(3) D.R. 1-102(A)(4)—a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(4) D.R. 1-102(A)(5)—a lawyer shall not engage in conduct that is prejudicial to the administration of justice;

(5) D.R. 1-102(A)(6)—a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.

Respondent's aforementioned conduct in the [I] matter violated the following Disciplinary Rules and Rule of Professional Conduct:

(1) D.R. 1-102 (A)(4)—a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(2) D.R. 1-102(A)(6)—a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law;

(3) D.R. 9-102(B)(3)—a lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them;

(4) R.P.C. 8.4(c)—it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

## IV. DISCUSSION

Respondent, [    ], was born on November 11, 1952 and was admitted to practice law in the Commonwealth of Pennsylvania on or about November 16, 1979. His office is located at [    ]. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

This matter is before the board after recommendation by the Hearing Committee that respondent receive a four-month suspension followed by a public reprimand based on his violation of ethical rules. Petitioner takes exception to the committee's recommendation that respondent receive a four-month suspension followed by a public reprimand which they argue is an inadequate sanction in response to respondent's misconduct. Petitioner correctly points out that the Rules of Disciplinary Enforcement do not provide for public reprimand after a suspension and recommend a suspension for a period of three to five years. Respondent filed a brief opposing petitioner's exceptions and recommends a private reprimand.

The first issue to be addressed is whether any ethical rules were violated by respondent. Petitioner carries the burden of proving respondent's professional misconduct. Evidence is sufficient to prove unprofessional misconduct if a preponderance of that evidence establishes the charged violations and the proof of such conduct is clear and satisfactory. *Office of Disciplinary Counsel v. Duffield,* 537 Pa. 485, 644 A.2d 1186 (1994). It is clear from the record that petitioner carried its burden as to Charges I and II, the [A] and [I] matters. The Hearing Committee found that petitioner did not establish a pattern by respondent of financial misdealings as alleged in Charge III, and review of the record supports this finding. Therefore we find that these two incidents were situational and occurred in an early stage of respondent's engaging in private practice, and do not constitute a pattern of financial misdealings.

In the [A] case respondent settled a case and engaged in a scheme to misrepresent to referral counsel his share of the fee. Respondent employed his clients in this action, he offered deceptive testimony and made mis-

leading statements. Respondent's actions are a violation of D.R. 1-102(A)(2), 1-102(A)(3), 1-102(A)(4), 1-102(A)(5), and 1-102(A)(6).

In the [I] matter respondent submitted a petition to the court for a minor's settlement, but failed to wait for court approval before taking his fee. Respondent also took more than what was allowed pursuant to the court order. Respondent then attempted to cover his tracks when Office of Disciplinary Counsel began an investigation several years later. The Hearing Committee set forth these findings in its report, but in the discussion section it concluded that respondent had not violated any ethical rules, as respondent's actions were an innocent mistake. The board agrees with petitioner that these conclusions are not consistent with the factual findings in the [I] matter. Review of the record demonstrates that respondent did violate D.R. 1-102 (A)(4), 1-102(A)(6), 9-102(B)(3), and R.P.C. 8.4(c).

The next issue to be addressed is the appropriate sanction to be imposed upon respondent in response to his misconduct. The correct disciplinary sanction will protect the interests of the public and maintain the integrity of the bar. *Office of Disciplinary Counsel v. Zdrok,* 538 Pa. 41, 645 A.2d 830 (1994). Each case must be judged according to its own unique set of circumstances. Prior cases lend guidance as they may contain similar facts to the instant case, however the outcomes of those cases do not dictate the board's recommendation in the instant case.

Respondent's actions consist of deceptive acts and attempts to conceal his misconduct. This case is more unusual than others involving dishonest conduct in that respondent achieved good results for his clients, but engaged in actions when concluding the cases that were

inappropriate. In the [A] matter, the clients were extremely happy with respondent's handling of the case. Respondent's dishonesty was not directed at his clients, but at the attorney with whom respondent was sharing his fee. In the [I] matter, although respondent took approximately $300 more for his fee than approved by the court, respondent subsequently made the clients whole in that he represented the minor for no cost in a serious juvenile matter. Again, the results achieved for the [I] were very good. The board also keeps in mind that respondent has no prior record of discipline, respondent's misconduct occurred a number of years ago, and respondent had many impressive witnesses testify as to his good character and competence in the law.

The board recognizes the mitigating circumstances in this case, but is mindful that they do not excuse respondent's misconduct. Deceptive behavior is not acceptable behavior for an attorney to engage in. In *Office of Disciplinary Counsel v. Holston,* 533 Pa. 78, 619 A.2d 1054 (1993), an attorney knowingly forged a divorce decree and certificate to avoid exposure of neglect and subsequently lied to a judge. The attorney was disbarred for this conduct. The facts of the instant case are not as severe and warrant a lesser discipline because in *Holston* the attorney not only lied to his client, who was relying on the authenticity of the divorce decree, but also falsified a court document. There could have been serious consequences for the client had he married again in reliance on the fake decree. By lying to his client, the attorney violated the trust that is the essential element of the lawyer/client relationship. The attorney lied in an attempt to hide his neglect of the client's

case. In the instant case respondent did not neglect his clients' cases, but rather worked promptly and efficiently to get the desired results. He did not lie to his clients about their cases, and they were able to rely on his actions. In the [I] matter, respondent did take more than his court-approved fee, and this may very well have been a result of poor record keeping as opposed to an intention to misappropriate client funds. Respondent did subsequently try to rectify this conduct by defending the minor gratis against rape charges. While we are cognizant that respondent's achievement of favorable results does not excuse his subsequent behavior, the board believes it is important to examine the gravity of harm suffered by the clients. In the case of *In re Oxman,* 496 Pa. 534, 437 A.2d 1169 (1981), *cert. denied,* 456 U.S. 975 (1982), two attorneys were found to have solicited clients, falsified contingent fee agreements, and requested witnesses to testify falsely. The Supreme Court found that the attorneys breached their ethical duties, violated the public trust, and had a deplorable disregard for the integrity of the judicial process. The attorneys received an 18-month suspension. No mitigating factors were cited. In the instant case, the conduct engaged in by respondent is somewhat similar to the conduct engaged in by the attorneys in *Oxman,* however respondent presented mitigating factors that would lessen the severity of the sanction. In the case of *In re Anonymous No. 25 D.B. 84,* 36 D.&C.3d 637 (1985), an attorney who engaged in unauthorized activity, forgery, and cover-up was suspended for two years. The attorney's dishonesty was toward his client and had a direct, negative effect on that client. The instant case involves similar activities of deception and

concealment, however respondent's actions did not occur until after satisfactory results were achieved for the clients. The mitigating factors present in this case warrant a lesser sanction. An attorney who permitted his law clerk to falsely represent himself to be the defendant in a case and subsequently did not reveal the false testimony was suspended for six months. *In re Anonymous Nos. 41 & 54 D.B. 80,* 26 D.&C.3d 511 (1983). The instant case is more serious than this and merits a graver sanction, as respondent's conduct was not restricted to an isolated incident, but occurred in three separate matters. In the case of *In re Anonymous No. 11 D.B. 88,* 4 D.&C.4th 164 (1989), an attorney failed to notify clients of his receipt of settlement funds and failed to promptly pay the correct amount of proceeds to the clients. This attorney received a three-month suspension. The attorney was found to have been neglectful and careless, but not deceitful. In the instant case, respondent also did not notify his client of the settlement order and did not promptly pay to the client the correct amount of proceeds. The instant case is more serious than the cited case, as respondent was deceitful in his conduct in the [I] matter and the [A] matter. An attorney who filed false pleadings and attempted to disguise his signature received a private reprimand. *In re Anonymous No. 77 D.B. 83,* 32 D.&C.3d 507 (1984). The board found that the attorney was very young and inexperienced and was sincerely contrite. The incident was isolated and the board determined that there was little danger of repetition. The instant case is more serious considering the many acts engaged in by respondent over an extended period of time in the [A] referral fee dispute.

The above-cited cases involve a spectrum of sanctions ranging from disbarment to private reprimand, however the board is convinced that respondent's dishonest conduct warrants some length of suspension. In consideration of his lack of prior record, the favorable results his clients received, and his impressive character testimony, the board recommends a one-year suspension. This suspension will remove respondent from the practice of law for a period of time, thus protecting the interests of the public and maintaining the integrity of the bar.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [      ], shall be suspended from the practice of law for a period of one year.

The expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Kerns dissents for a four-month suspension.

Board Member Nix dissents for a two-year suspension.

Board Members Paris and Carson did not participate in the August 17, 1995 adjudication.

## ORDER

And now, March 21, 1996, upon consideration of the report and recommendations of the Disciplinary Board dated February 21, 1996, it is hereby ordered that [respondent], be and he is suspended from the bar of this Commonwealth for a period of one year, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

236

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Castille dissents and would suspend respondent for a period of four months.