605 A.2d 1204

**Samuel S. LYNESS, M.D., Appellant,**

**v.**

**COMMONWEALTH of Pennsylvania, STATE
BOARD OF MEDICINE, Appellee.**

Supreme Court of Pennsylvania.

Argued April 11, 1991.

Decided March 18, 1992.

Reargument Denied June 30, 1992.

Jean B. Green, Donald J. Martin, Norristown, for appellant.

John F. Alcorn, Joyce McKeever, Harrisburg, for appellee.

Before FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

OPINION OF THE COURT

CAPPY, Justice.

This is an appeal instituted by a physician, Samuel S. Lyness, M.D., whose license to practice medicine and surgery in the Commonwealth of Pennsylvania was revoked by the State Board of Medicine, after that Board initiated disciplinary hearings and concluded that Dr. Lyness had committed acts constituting immoral and unprofessional conduct in violation of the Medical Practice Act.[1]

The issue on appeal is whether a violation of due process occurs under the Pennsylvania Constitution when an administrative board, such as the State Board of Medicine, both determines that a professional licensing prosecution should be initiated, and then acts as the ultimate fact-finder in determining whether a violation has occurred. More specifically, this Court must address whether such a commingling of prosecutorial and adjudicative functions within a single multi-member administrative board is consistent with this Court's previous decision in *Dussia v. Barger*, 466 Pa. 152,

---

1. The charges against Dr. Lyness were brought under the Medical Practice Act of July 20, 1974, Pub.L. No. 551, *as amended, formerly* 63 P.S. § 421.15(a)(8). That section has since been repealed and replaced by a corresponding section in the Medical Practice Act of 1985, Act of December 20, 1985, Pub.L. No. 457, *as amended,* 63 P.S. § 422.41(8) (Purdon 1991).

351 A.2d 667 (1975). For the reasons that follow, we conclude that such a commingling is not consistent with the notion of due process embodied in the Pennsylvania Constitution.

## FACTUAL BACKGROUND

On January 8, 1985, an emergency meeting was called of the State Board of Medical Education and Licensure, forerunner of the present State Board of Medicine (hereinafter "Board"). The Board is an administrative body established by statute in Pennsylvania, with the authority to license, investigate complaints and impose disciplinary sanctions with respect to medical professionals practicing in the Commonwealth. *See* Medical Practice Act of 1985, Act of December 20, 1985, Pub.L. No. 457, *as amended*, 63 P.S. § 422.1 *et seq.* (Purdon Supp.1990).[2]

Acting at the request of the Board's prosecuting attorney, Joseph E. Hagan, Esquire,[3] Board Chairperson Barbara K. Shore, Ph.D. convened the emergency meeting by telephone conference call. Eight members of the eleven-person Board were in attendance.[4] The subject of the meeting was to consider whether Mr. Hagan would be

2. The State Board of Medicine is an administrative board of the Commonwealth within the Bureau of Professional and Occupational Affairs (Bureau). The Bureau is in turn a division of the Department of State, which is comprised of 26 licensing boards. *See* 63 P.S. § 422.2, 422.6(b) and 422.7(a).

3. The Health Care Services Malpractice Act of October 15, 1975, Pub.L. No. 390, *as amended*, 40 P.S. § 1301.901, authorizes the board to hire such investigators and attorneys as are necessary to carry out their duties. In practice, a complaints officer of the Bureau of Professional and Occupational Affairs forwards complaints to the Board prosecutor, who is an assistant counsel assigned by the Office of General Counsel. *See* 49 Pa.Code § 16.41 (1987).

4. Those eight Board members present were Chairperson Barbara K. Shore, Ph.D., Richard C. Lyons, M.D., Shirley Fox, R.N., Joseph T. Marconis, M.D., John H. Moyer, M.D., Jeanne McKelvey, Esquire (public member), Guy L. Kratzer, M.D., and Donald C. Reid, M.D. (representing the former Secretary of Health). The Medical Practice Act of 1985 specifies that the Board shall be comprised of eleven members. *See* 63 P.S. § 422.3. There was one vacancy on the Board in 1985.

authorized to cite physician Samuel S. Lyness, M.D. (Lyness) for a formal hearing, based upon a complaint of sexual molestation of a female patient which had been brought to his attention.

Mr. Hagan represented to the Board that he had investigated a patient complaint which raised the following allegation. On November 26, 1984, Dr. Lyness had performed a partial craniotomy on a 17–year–old female patient ("A.Z."). Two days later, on November 28, 1984, the patient filed a report with local police alleging that on the prior evening, while in intensive care recovering from brain surgery, Dr. Lyness had fondled her vagina and placed his penis in her mouth.

Following discussion by the Board, seven out of the eight members in attendance voted to cite Dr. Lyness for a formal hearing, essentially determining that sufficient evidence existed to initiate disciplinary action. Only Board member Donald C. Reid, M.D., abstained. Prosecutor Hagan, on January 9, 1985, therefore issued an Administrative Complaint and Order to Show Cause, lodging formal charges against Dr. Lyness. The Complaint was issued under the signature of Barbara K. Shore, Ph.D., Chairperson of the Board.

In accordance with procedures established under Article IX of the Health Care Services Malpractice Act ("Malpractice Act"), Act of October 15, 1975, Pub.L. No. 390, *as amended*, 40 P.S. § 1301.901 thru § 1301.907, and various administrative regulations promulgated thereunder, *see* 49 Pa.Code § 16.41 (1987) *et seq.*, the Board appointed a neutral Hearing Examiner, Louis E. Seltzer, Esq., to preside over the disciplinary proceedings initiated against Dr. Lyness. Testimony was commenced in February of 1985; however, criminal charges were filed against Dr. Lyness in several county courts in Pennsylvania. The Commonwealth Court stayed the administrative hearings before the Board, in order that these would not in any way taint pending criminal proceedings involving Dr. Lyness.

Dr. Lyness was acquitted of all charges by juries in Montgomery and Delaware Counties. Board hearings thereafter resumed in front of Hearing Examiner Seltzer. The original Administrative Complaint was amended to include seven additional counts against Dr. Lyness, involving six additional female patients who had come forward alleging sexual molestation similar to that described in the original Complaint. These new incidents took place over a period of eight years, between 1976 and 1984, and generally involved patients alleging that they had awoken from sedation to find Dr. Lyness engaged in sex acts with them.

Lengthy hearings on all charges were conducted by the Board-appointed Hearing Examiner between September, 1985 and September, 1986. On June 22, 1987, Hearing Examiner Seltzer issued his Adjudication and Order, finding that the allegations of six out of the seven Complainants were "overwhelmingly credible." His formal order directed that Dr. Lyness' license be suspended for a period of five years, and that Dr. Lyness submit himself to treatment by a physician (presumably a psychiatrist) designated by the Board.

Both Dr. Lyness and the Board's prosecuting attorney filed an application for review to the Board, as authorized by Section 905 of the Malpractice Act, 40 P.S. § 1301.905, which effectively permits *de novo* review of the Hearing Examiner's findings by the Board. On March 22, 1988, the Board convened a meeting and voted to affirm the factual findings of the Hearing Examiner. However, the Board found the sanction imposed by the Hearing Examiner to be inconsistent with the gravity of the misconduct, and instead ordered the *permanent revocation* of Dr. Lyness' license to practice medicine and surgery in the Commonwealth. The vote in favor of this action was six in favor, one abstention.[5] Of the original members of the Board who had voted to

5. A total of seven Board members were present at the March 22, 1988 meeting. Those voting to affirm the findings of the Hearing Examiner, yet to revoke Dr. Lyness' license permanently, were Gary W. Lyons, M.D., Jason C. Shu, M.D., George L. Shevlin, Commissioner of Professional and Occupational Affairs, Ronald David, M.D. (representing Secretary of Health, Guy L. Kratzer, M.D.), James Fox, M.D. A

initiate prosecution against Dr. Lyness in January of 1985, three Board members (Barbara K. Shore, Ph.D., Guy L. Kratzer, M.D. and James, M.D.) participated in the meeting in March of 1988 at which Dr. Lyness' license was revoked; Ms. Shore did not cast a vote because she presided over the meeting.[6]

On April 22, 1988, Dr. Lyness filed a Petition for Review in Commonwealth Court, alleging *inter alia* that there existed an improper commingling of prosecutorial and adjudicatory functions by the Board. The Commonwealth Court, in an *en banc* decision, affirmed the order of the State Board of Medicine. *See Lyness v. Commonwealth of Pennsylvania State Board of Medicine,* 127 Pa.Commw. 225, 561 A.2d 362 (1989). The Commonwealth Court rejected Dr. Lyness' argument that a multi-member administrative board, such as the State Board of Medicine, which performs both prosecutorial and adjudicatory functions constitutes a *per se* violation of due process. In reaching this conclusion the Commonwealth Court relied heavily upon its own decision in *Oppenheim v. Department of State,* 74 Pa.Commw. 200, 459 A.2d 1308 (1983). *Oppenheim* held that a pre-hearing determination of probable cause by an administrative board did not result in a *per se* invalid adjudication "as long as the prosecutorial and investigatory aspects of the matter are adequately separated from the adjudicatory function." [7] The court below also distinguished the instant case from our previous decision in

single Board member, Barbara K. Shore, Ph.D., abstained because she presided over the meeting. Board members not present at the March 22nd meeting were Joseph T. Marconis, M.D., Chairman, Jeanne W. McKelvey, Esquire, and Joshua A. Perper, M.D.

6. Two other Board members as of March, 1988, Marconis, M.D. and Jeanne W. McKelvey, Esquire, were members of the Board who voted to initiate proceedings against Dr. Lyness in January of 1985; however, these two individuals were absent from the March, 1988 meeting and thus did not cast votes relating to the sanctions imposed.

7. *Oppenheim,* 74 Pa.Commw. at 214, 459 A.2d at 1316. In *Oppenheim,* the State Dental Council and Examining Board ("Dental Board") suspended the licenses of two dentists who had permitted assistants, not licensed as dental hygienists, to perform procedures requiring a license. *Id.,* 74 Pa. Commonwealth Ct. at 202, 459 A.2d at 1310. The Dental Board initiated proceedings, held a formal hearing, and im-

*Dussia,* on the thread of logic that the instant case involved a multi-member board, whereas *Dussia* involved a single *individual* serving as both prosecutor and adjudicator. *Lyness,* 127 Pa.Commw. at 228, 561 A.2d at 365. The Commonwealth Court nevertheless vacated the decision of the Board, and remanded for further proceedings; however, their conclusion related strictly to the issue of laches, which is not relevant in the instant appeal.[8]

On October 15, 1990, this Court granted Dr. Lyness' Petition for Allowance of Appeal limited to the due process issue regarding the improper commingling of the Board's prosecutorial and adjudicatory functions. The petition was denied in all other respects.

## DISCUSSION

The guarantee of due process of law, in Pennsylvania jurisprudence, emanates from a number of provisions of the Declaration of Rights, particularly Article I, Sections 1, 9 and 11 of the Pennsylvania Constitution.[9] These provisions in turn enjoy a long history in the Commonwealth, tracing

posed disciplinary sanctions. *Id.* The Commonwealth Court found no violation of due process, concluding that where a multi-member administrative body performs prosecutorial, investigative, and adjudicatory functions by statutory design, there is no violation of due process unless "actual bias" is shown. *Id.,* 74 Pa. Commonwealth Ct. at 214, 459 A.2d at 1316.

The Commonwealth Court in *Oppenheim* apparently derived this approach from the U.S. Supreme Court decision in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

8. Judge Crumlish filed a dissenting opinion in the Commonwealth Court in which Judge Colins joined. In his dissent Judge Crumlish recognized the unlawful commingling of functions on the part of the Board and in arguing for reversal he referred to his earlier dissent in *Bruteyn Appeal,* 32 Pa.Commw. 541, 380 A.2d 497 (1977) where he had observed:

The decision to prosecute is the fundamental prosecutorial decision and necessitates a determination that there is probable cause to believe that a defendant is guilty. Such a predetermination of guilt cannot be forgotten by an individual when he in effect puts on new robes and hears the case as judge.

*Id.,* 32 Pa. Commonwealth Ct. at 552, 380 A.2d at 503.

9. WOODSIDE, *Pennsylvania Constitutional Law,* 120–121 (1985).

their way back to early documents, including the English Magna Charta. *See* T. White, Constitution of Pennsylvania 114 (1907). As we have stated in the past, in attempting to shed light on the procedural face of due process: "[w]hile not capable of exact definition, the basic elements of procedural due process are adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction of the case." *Commonwealth v. Thompson*, 444 Pa. 312, 316, 281 A.2d 856, 858 (1971).

■ This Court has recognized as well established the principle that "due process is fully applicable to adjudicative hearings involving substantial property rights...." *Soja v. Pa. State Police*, 500 Pa. 188, 193, 455 A.2d 613, 615 (1982). Such property rights perforce include the right of an individual to pursue a livelihood or profession, thus triggering the protective mechanism of procedural due process. *See, e.g., Roche v. State Board of Funeral Directors*, 63 Pa. Commw. 128, 437 A.2d 797 (1981). *A fortiori*, this is true where, as here, an administrative board is empowered by the State to regulate the conduct of professionals and ultimately impose sanctions which may include the revocation of a license to practice medicine in the Commonwealth.

In determining what process is due Pennsylvania citizens, this Court has established a clear path when it comes to commingling prosecutorial and adjudicatory functions. There is a strong notion under Pennsylvania law that even an *appearance* of bias and partiality must be viewed with deep skepticism, in a system which guarantees due process to each citizen. Consequently, this Court in *Dussia* struck down a regulation which vested power in a police commissioner to both initiate court-martial proceedings against a state police officer (a prosecutorial function), and thereafter exercise ultimate judicial determination as to guilt or innocence.[10] Then–Justice, now Chief Justice Nix, writing for this Court in *Dussia*, made clear that "actual bias" was not the watchword in ferreting out violations of due process

10. *Dussia* involved Section 711 of the Administrative Code, Act of April 9, 1929, Pub.L. No. 177, art. VII, § 711, as amended December 5,

under the Pennsylvania Constitution. As this Court had written earlier in *Schlesinger Appeal*, 404 Pa. 584, 172 A.2d 835 (1961):

> Moreover, a predilection to favor one side over the other is not required in order to vitiate a judicial proceeding as being violative of due process. Merely, 'a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true' is sufficient."

*Id.* 404 Pa. at 598, 172 A.2d at 841.

Justice Nix concluded in *Dussia* that the overlap of prosecutorial and adjudicatory functions, even where not complete, was anathema to the notion of due process in Pennsylvania, where citizens rightly presume that the same individual does not wear the mantel of zealous prosecutor and impartial judge. Justice Nix wrote:

> While in the instant case the Commissioner did not in fact have the responsibility of the entire prosecutorial role, we do not believe that this fact alone is sufficient basis for distinguishing the instant case from the authorities cited *Supra*. *The decision to institute a prosecution is such a fundamental prosecutorial function that it alone justifies concluding a dual capacity where the individual also is charged with the responsibility of making the ultimate determination of guilt or innocence.* Moreover, it is a decision which requires a judgment as to the weight of the evidence against the accused, a judgment which is incompatible with the judicial function of providing an impartial forum for resolution of the issues presented.

*Dussia*, 466 Pa. at 165, 351 A.2d at 674 (emphasis added.)

The Commonwealth Court's attempt in the instant case to distinguish *Dussia* on the basis that *Dussia* involved a

1967, Pub.L. No. 671, § 1, 71 P.S. § 251 (Supp.1974–75), as implemented by State Police Field Regulation 3.03–E. Together, these provisions gave the Commissioner sole power to decide when a court-martial board should be convened; and also gave him (essentially) power of *de novo* review over the board's decision, resting the ultimate decision as to guilt or innocence and the sanction to be imposed in the hands of the Commissioner.

single individual, rather than (as here) a multi-member Board, rings hollow at best. Due process is not swept under the carpet simply because it is transgressed by a group of people, rather than a single individual. Indeed, the due process guaranty of the Pennsylvania Constitution is primarily directed at governmental (i.e. state) action, which generally presumes action of a municipal, administrative, or state governmental body, rather than a single individual.

Nor is the threat to due process inconsequential where eight members of an administrative board (here the Board of Medicine), wear the hat of the prosecutor and make the determination that probable cause exists to bring formal charges; and then the same board—with a number of members identical—later wears the robe of the judge to make a presumably impartial adjudication which will determine the fate of a physician's license to practice medicine in this Commonwealth. Whether it is one person or eight who merge the prosecutorial and adjudicatory roles, the danger is equally serious.

Thus, a mere possibility of bias under Pennsylvania law is sufficient to raise the red flag of protection offered by the procedural guaranty of due process. Not only does our decision in *Dussia* make this point explicit, but a steady string of cases over the past three decades has firmly established such a principle as a matter of Pennsylvania law. In *Gardner v. Repasky*, 434 Pa. 126, 252 A.2d 704 (1969), this Court invalidated a procedure whereby the same individual was a member of the Fire Board which brought the initial complaint against a police officer, and the Civil Service Commission which heard the officer's appeal, thereafter suspending him. In *Gardner*, Mr. Justice Cohen stressed that the mere *appearance* of bias must be avoided, and concluded: "A man cannot sit as judge when he is a member of a board which has brought the accusations." *Id.* 434 Pa. at 130, 252 A.2d at 706.

In *Commonwealth, Department of Insurance v. American Bankers Insurance*, 478 Pa. 532, 387 A.2d 449 (1978),

this Court in a *per curiam* opinion invalidated administrative sanctions imposed by the Insurance Department of the Commonwealth of Pennsylvania, which had charged American Bankers Insurance Company of Florida with transgressions of the Pennsylvania insurance laws. The associate general counsel of the Insurance Department had supervised the office which initiated charges, and then sat as a Commissioner presiding over the hearings. This Court wrote: "Such a commingling of prosecutorial and adjudicatory functions in one individual offends fundamental notions of due process and is constitutionally impermissible." *Id.*, 478 Pa. at 534, 387 A.2d at 450.

Moreover, the instant case is quite different from the situation presented in *State Dental Council and Examining Board v. Pollock*, 457 Pa. 264, 318 A.2d 910 (1974), relied upon heavily by the Board in its brief. *Pollock*, a pre-*Dussia* decision also authored by then-Justice now Chief Justice Nix, involved a determination of the State Dental Council and Examining Board to suspend Dr. Pollock's license to practice dentistry for allowing an unlicensed assistant to perform work as a dentist. Dr. Pollock asserted that his due process rights had been violated because the complaint was received by the Dental Board, an investigation was conducted by the Law Enforcement Bureau of the Commission of Professional and Occupational Affairs (a distinct administrative entity under the Pennsylvania Department of State), and an assistant attorney general in the Legal Office of that Commission prosecuted the case before the Board. *Pollock*, 457 Pa. at 269, 318 A.2d at 714. In concluding that there was no violation of appellant's due process rights under such facts, this Court stated:

> It is not uncommon for large agencies to fulfill both the prosecutory and judicial functions (e.g., the Federal Trade Commission and the Public Utilities Commission). So long as the functions are separated adequately, Due Process is preserved ... *A fortiori*, there is no Due Process violation in the administrative structure employed here, *where both functions were handled by*

*distinct administrative entities with no direct affiliation to one another* ... The cases cited by appellant such as *Schlesinger, supra; Gardner, supra;* and *Murchison, supra,* where the same individuals actually participated in both prosecutory and judicial roles are clearly distinguishable.

*Id.,* 457 Pa. at 271–72, 318 A.2d at 914–15. (emphasis added).[11]

*Pollock* and similar cases stand only for the sensible proposition that in the modern world of sprawling governmental entities akin to corporations it would be both unrealistic and counterproductive to insist that administrative agencies be forbidden from handling both prosecutorial and adjudicatory functions, where such roles are parcelled out and divided among distinct departments or boards. Efficiency and cost-effectiveness are certainly desirable ends. Indeed, each administrative board and judge is ultimately a subdivision of a single entity, the Commonwealth of Pennsylvania, but this does not render their collective work as prosecutors, investigators and adjudicators constitutionally infirm, nor create an imminent threat of prejudice.

What our Constitution requires, however, is that if more than one function is reposed in a single administrative entity, walls of division be constructed which eliminate the threat or appearance of bias. As then-Justice Nix stated so percipiently in concurrence in *American Bankers,* a "mere tangential involvement" of an adjudicator in the decision to initiate proceeding is not enough to raise the red flag of procedural due process. *American Bankers,* 478 Pa. at 545, 387 A.2d at 456. Our constitutional notion of due process does not require a *tabula rasa. Soja,* 500 Pa. at 197, 455 A.2d at 617. However, where the very entity or individuals involved in the decision to prosecute are "signifi-

11. Some question was also raised in *Pollock* concerning the fact that the assistant attorney general had also aided the Board in drafting the final adjudication. *Id.,* 457 Pa. at 272, 318 A.2d at 915. Although we in no way endorsed that procedure, we found no due process violation because "such assistance came after the Board had reached its decision and the assistant in no way participated in or influenced the decision." *Id.*

cantly involved" in the adjudicatory phase of the proceedings, a violation of due process occurs. *American Bankers*, 478 Pa. at 546, 387 A.2d at 456. (Nix, J. concurring). Such a conclusion is only made more compelling where, as here, the administrative Board has virtual *carte blanche* in reviewing the Hearing Examiner's findings and replacing it with its own adjudication, with very limited appellate review in the Commonwealth Court.[12]

██ In the instant case, the procedures followed by the Board, pursuant to the applicable administrative regulations, clearly created an unconstitutional intermingling of the prosecutorial and adjudicatory functions in a single entity. Allegations of misconduct were investigated by the Board's prosecuting attorney, Mr. Hagan, and presented to the Board for its consideration. *See* 49 Pa.Code § 16.62(c).[13] The Board convened a meeting, discussed the evidence, and determined there was sufficient cause to bring formal charges. An Order to Show Cause, triggering the formal hearing mechanism, was signed by Barbara K. Shore, Ph. D., Chairperson of the Board.

**12.** The right to a fair and impartial tribunal in the first instance is a cornerstone of our notion of due process. This point was eloquently made by the United States Supreme Court in *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), where the village mayor, who by his position had a pecuniary interest in the outcome of traffic violations, was the sole adjudicator of such violations. The *Ward* Court in finding that an appellant convicted by this procedure had been denied due process, stated:

Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance. [footnote omitted].

409 U.S. at 61–62, 93 S.Ct. at 84.

**13.** The regulations technically provide that the prosecutor shall make a "recommendation" to the Board, and thereupon await "review and authorization" of the Board. 49 Pa.Code § 16.62(c) (1987). No procedures are set out in the regulations for this "recommendation" process, but it clearly contemplates that the Board, and not the prosecutor, shall make the ultimate determination whether sufficient evidence exists to prosecute.

Once a Hearing Examiner rendered a decision pursuant to Article IX of the Health Care Services Malpractice Act, 40 P.S. §§ 1301.901–905, the matter was appealed, and the evidence was reviewed by the same Board, on a *de novo* basis. *See* 40 P.S. § 1301.905(a); 49 Pa.Code § 16.81(a) (1990). Three of the members of the Board who made the determination to prosecute Dr. Lyness went on to participate in the Board's deliberation with respect to imposing a sanction; two of these cast votes to suspend his license permanently.[14]

Whether or not any actual bias existed as a result of the Board acting as both prosecutor and judge is inconsequential; the potential for bias and the appearance of non-objectivity is sufficient to create a fatal defect under the Pennsylvania Constitution. *Dussia; Schlesinger Appeal; Gardner; American Bankers.* Nor is the Board persuasive in analogizing this situation to that of a judge who presides at a preliminary hearing, determining that probable cause exists to hold a defendant for trial, and thereafter presides over the same defendant's trial.[15] In that situation, the defendant possesses the right to invoke his right to trial by jury, interposing a group of unbiased jurors between himself and the judge who might have heard testimony and seen evidence prior to trial that could taint his or her objectivity as an adjudicator. Under the instant scheme, however, there exists no such constitutional buffer between

**14.** Barbara K. Shore, Ph.D. abstained, because she was presiding over the meeting, but certainly participated in the adjudicatory phase. It is worth noting that an additional two Board members who had voted to prosecute Dr. Lyness, Marconis and McKelvey, still sat on the Board at the time sanctions were imposed. However, these two individuals were fortuitously absent from the March 22, 1988 meeting.

**15.** Appellee here relies upon the decision of the U.S. Supreme Court in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In *Withrow,* our federal brethren seemingly embraced a different view of due process under the United States Constitution. However, *Withrow* is not binding upon this Court in determining the meaning of the distinct due process guarantees under the Pennsylvania Constitution and related case-law. Indeed, our decision in *Dussia* was handed down several months after *Withrow.* Thereafter, we denied a petition for re-hearing of *Dussia,* indicating our high level of comfort with Pennsylvania law.

the Board as prosecutor and the Board as adjudicator. The accused is forced to face the same body which heard allegations and formed prosecutorial judgments concerning probable cause (some of it perhaps inadmissible as formal evidence), now dressed in the robe of impartial jurist. Such a schizophrenic face of justice, poses subtle dangers which threaten complete objectivity and is not permissible under the due process guaranty of the Pennsylvania Constitution, as interpreted by this Court for over three decades.[16]

As in *Dussia,* we do not here declare any statute enacted by the legislature unconstitutional. *Dussia,* 466 Pa. at 166, 351 A.2d at 675. Rather, the fatal defect here lies in the administrative regulations, and the loose interpretation afforded those regulations by the Board; which defect can be readily cured by placing the prosecutorial functions in a group of individuals, or entity, distinct from the Board which renders the ultimate adjudication.

In view of the constitutional infirmities in the instant case, allowing the appearance and possibility of bias, we remand this matter to the Board for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

PAPADAKOS, J., files a concurring opinion.

**16.** We note that the parties raise an issue concerning an article in the *Philadelphia Inquirer* dated July 25, 1990, in which it was reported: "Responding to the protestors, board member Barbara K. Shore of Pittsburgh said the Board had remained consistently in favor of revoking the doctor's license." The article went on to quote Ms. Shore as follows: "But because of a recent court decision, 'we then had no choice but to return the license,' she said."

There is some question whether the above newspaper article is part of the official record in this case, and in any event this Court rejects Appellant's contention that the quote demonstrates actual bias on the part of the Board. However, this provides a useful illustration of the *appearance* of bias which our case-law is designed to prevent. Ms. Shore was both the individual who signed the initial order lodging formal charges against Dr. Lyness and thereafter presided over the meeting at which his license was permanently revoked. No representative of a government agency should be placed in such an awkward position, allowing ambiguous inferences to be drawn from his or her official actions.

McDERMOTT, J., files a dissenting opinion in which FLAHERTY, J., joins.

NIX, C.J., and LARSEN, J., did not participate in the consideration or decision of this case.

PAPADAKOS, Justice, concurring.

I join in the opinion of the majority but write separately to express my concern that a remand, as proposed, may be an exercise in futility in that we are remanding to an entity which we have already determined to be tainted in denying due process to the Appellant by commingling prosecutorial and adjudicative functions.

I do not perceive how this entity, the State Board of Medicine, can erase its participation in the prosecutorial function so as to comply with the majority mandate that the Appellant is entitled to a Board not involved in the prosecutorial function.

The majority, it seems to me, is acting in the blind by remanding to a Board whose present composition may be the same as the tainted Board which denied due process to the Appellant. We do not know what members have left the Board and been replaced by members who did not participate in any of the proceedings involving this Appellant. Unless the entire Board has been replaced, I feel that Appellant's due process rights are still implicated.

Is the majority sending a signal that the Board should rewrite its regulations to provide for a separation of the functions and then reinstitute proceedings against the Appellant, *ab initio*, and to continue to do so until it gets the matter right? I certainly believe a rewrite of the regulations is in order but I am not so sure of the reinstitution of complaints after so much water has gone under the bridge.

I would normally be constrained to agree with the Dissent of former President Judge Crumlish, joined by Judge Colins, of the Commonwealth Court, filed at 127 Pa.Commonwealth Ct. 225, 561 A.2d 362 (1989), reversing the action of the Board and dismissing the charges against Appellant.

But, it may be that these are matters better left to another day. The Board may act in such a manner that my concerns will be satisfied.

McDERMOTT, Justice, dissenting.

There can be no question that a prosecutor cannot be the judge; in those cases cited by the majority we have consistently so held. Nor would we tolerate a prosecutor participating in the decision of a Board during the adjudicative process. The majority now holds that a Board may not order an inquiry without being contaminated by the reason an inquiry should be ordered; this upon the ground that as ultimate reviewing authority they have already been prejudiced because they ordered a hearing.

There is no evidence here that the Board did anything but respond to what, without question, was sufficient probable cause proffered through patient complaints. The complaints were processed by two levels of consideration, the complaint officer and counsel, before presentation to the Board: neither of which were charged with bias. The Board did not act on its own motion to secure evidence, accuse, or order an inquiry on information known to it alone; nor is there evidence that the Board believed the complaints to be true when they ordered an inquiry. Lacking such evidence of initial prejudice, the majority nonetheless lays down a *per se* rule that if the Board orders an inquiry upon complaints, they are ineradicably tainted.

By statute the Board is composed of lay and professionals in the medical field; it is designed as a "buffer" to determine whether prosecutors have sufficient, demonstrable probable cause to proceed with a prosecution. That salutary protection against prosecutorial excess is now obviated upon the flimsy ground that to hear evidence that an inquiry should go forth forever taints the Board with prejudice. The majority obviously finds the Board short of professional ability and personal integrity, a shortage they think best supplied by prosecutors.

The majority obviously prefers that prosecuting officials decide, without any "buffer" that a prosecution shall proceed. That is to say that instead of the "buffer" of a Board to whom probable cause must be presented, the prosecutors can proceed at will.

I would adopt the due process analysis of the Commonwealth Court and therefore I am compelled to dissent.

Mr. Justice FLAHERTY joins in this Dissenting Opinion.