Richard C. Culbertson, :
                    Petitioner :
                              :
        v.                    : No.  152 C.D. 2022
                              : Submitted:  March 3, 2023
Pennsylvania Public Utility   :
Commission,                   :
                    Respondent :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                    FILED:  August 17, 2023


Richard C. Culbertson (Culbertson), pro se, petitions for review of the Pennsylvania Public Utility Commission's (Commission) December 16, 2021 order, which (a) adopted the Recommended Decision of Administrative Law Judge Mark A. Hoyer (ALJ Hoyer), (b) denied, in large part, and granted, in limited part, Culbertson's exceptions, (c) approved in its entirety and without modification a Joint Petition for Settlement (Joint Petition) filed on September 7, 2021, by Columbia Gas of Pennsylvania, Inc. (Columbia), the Bureau of Investigation and Enforcement of the Commission (I&E),[1] and every interested party except Culbertson and Ronald

---

[1] I&E "serves as the prosecutory bureau for purposes of representing the public interest in ratemaking . . . matters before the Office of Administrative law Judge."  Pennsylvania Public Utility Commission, *Offices and Staff Directory*, https://www.puc.pa.gov/about-the-puc/offices-and-staff-directory/ (last visited August 16, 2023).

Lamb (Lamb), (d) reduced Columbia's proposed annual increase in base rate operating revenues from approximately $98.3 million to $58.5 million, and (e) dismissed Culbertson's and Lamb's Complaints. Upon review, we affirm.

## I.    Background

"Columbia provides natural gas distribution, sales, transportation, and/or supplier of last resort services to approximately 436,000 retail customers in portions of 26 counties of Pennsylvania." Reproduced Record (R.R.) at 181. Columbia qualifies as a "public utility" and a "natural gas distribution company" under Pennsylvania's Public Utility Code (Code).[2] *Id.* at 181, 323; *see also* 66 Pa.C.S. §§ 102, 2202. On March 30, 2021, Columbia filed Supplement No. 325 to its tariff to be effective for services rendered on and after May 29, 2021. R.R. at 181, 320. Supplement No. 325 proposed changes to Columbia's rates that were designed to provide an approximately $98.3 million increase in Columbia's annual revenue. *Id.* at 181, 320-21.

The following parties filed Complaints or Petitions to Intervene opposing Columbia's Supplement No. 325: the Office of Consumer Advocate (OCA),[3] the Office of Small Business Advocate (OSBA),[4] Columbia Industrial Intervenors,

---

[2]  66 Pa.C.S. §§ 101-3316.

[3]  Section 902-A(a) of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, added by the Act of July 9, 1976, P.L. 903 (The Administrative Code), authorizes the OCA, as a position within the Office of Attorney General, to represent the interest of consumers before the Commission. 71 P.S. § 309-2(a). Section 905-A of The Administrative Code requires the Commission to notify the OCA when a public utility proposes to change its rates or take any actions which may substantially affect the interest of consumers. 71 P.S. § 309-5. Sections 904-A and 905-A of The Administrative Code permit the OCA to intervene and "represent the interest of consumers as a party . . . in any matter properly before the [C]ommission, and before any court or agency." 71 P.S. §§ 309-4, 309-5.

[4]  Section 3 of the Small Business Advocate Act, Act of December 21, 1988, P.L. 1871, 73 P.S. §§ 399.41-399.50b (SBAA), authorizes the OSBA, as an office within the Department of **(Footnote continued on next page…)**

2

Shipley Choice, LLC d/b/a Shipley Energy Company (Shipley) and the Retail Energy Supply Association (RESA),[5] the Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania (CAUSE-PA), the Pennsylvania State University, the Pennsylvania Weatherization Providers Task Force, Culbertson, and Lamb. R.R. at 180-81, 321.

On May 6, 2021, the Commission entered an order suspending Columbia's Supplement No. 325 until December 29, 2021.[6] R.R. at 182, 321. The Commission's order also "instituted an investigation to determine the lawfulness, justness, and reasonableness of the rates, rules, and regulations contained in [Supplement No. 325] and assigned the case to the Office of the Administrative Law Judge for the prompt scheduling of such hearings as may be necessary culminating in the issuance of a Recommended Decision." *Id.* at 321. The parties then "conducted substantial formal and informal discovery." *Id.* at 183.

ALJ Hoyer held two public input hearings in June 2021. R.R. at 322. On August 4, 2021, ALJ Hoyer conducted an evidentiary hearing, "for the purpose of admitting evidence into the record and allowing [pro se] Complainant Mr. Culbertson to conduct cross-examination of Columbia's [President], Mark Kempic."

---

Community and Economic Development, to represent the interest of small business consumers before the Commission. 73 P.S. § 399.43. Section 7 of the SBAA requires the Commission to notify OSBA when a public utility proposes to change its rates or take any actions which may substantially affect the interest of small business consumers. 77 P.S. § 399.47. Sections 5 and 7 of the SBAA permit the OSBA to intervene and "represent the interest of small business consumers as a party . . . in any matter properly before the Commission, and before any court, or agency." 77 P.S. §§ 399.45, 399.47.

[5] Shipley and RESA filed an amended petition to intervene to substitute RESA for Interstate Gas Supply, Inc. (IGS) in Shipley and IGS's previously filed petition to intervene. R.R. at 321.

[6] Section 1308(b) of the Code permits the Commission to suspend a public utility's proposed rate increase for up to six months while a hearing and decision are pending. *See* 66 Pa.C.S. § 1308(b).

*Id.* After the hearing, Columbia and Culbertson filed briefs in support of their positions.[7] *Id.*

On September 7, 2021, Columbia, I&E, each complainant except Culbertson and Lamb, and each intervenor (collectively, Joint Petitioners), filed the Joint Petition and individual statements in support of a proposed settlement. R.R. at 322. In Supplement No. 325, "Columbia proposed rates designed to result in an increase in annual distribution operating revenues of approximately $98.3 million, an increase of approximately 19.9%." *Id.* at 324. This would increase the average monthly bill for a residential customer using 70 therms[8] of gas per month from $100.77 to $115.37. *Id.* Under the settlement terms the parties proposed in the Joint Petition, Columbia's rates would only increase annual distribution operating revenues by approximately $58.5 million, which is an increase of approximately 11.9% over existing rates and would only increase the average monthly bill for a residential customer using 70 therms of gas per month from $100.77 to $109.10. *Id.* The Joint Petition proposed a total resolution of all issues raised by Joint Petitioners, but it reserved Culbertson's issues for litigation.[9] *Id.* at 327.

---

[7] ALJ Hoyer ultimately struck approximately nine pages from Culbertson's brief due to its reference to confidential settlement discussions. R.R. at 322.

[8] A "therm" is "the industry standard used by almost all natural gas providers across the country" to "measure the energy output of a unit of gas." Natural Gas Plans, *What is the Difference Between a CCF, MCF, and Therm?*, https://naturalgasplans.com/difference-between-ccf-mcf-therm/ (last visited August 16, 2023). "It is generally accepted that 100 cubic feet of natural gas . . . is the energy equivalent of burning one therm of gas. But the true conversion . . . [is] that 100 cubic feet . . . of natural gas equals . . . 1.037 therms." *Id.* (emphasis omitted).

[9] On September 8, 2021, ALJ Hoyer entered an order (the "Eleventh Interim Order") "directing that any objections or comments to the Settlement be filed and served by September 17, 2021." R.R. at 323. On September 24, 2021, Culbertson filed a "Motion to Properly Respond to the Black Box Settlement Agreement Among the Participants (excluding Culbertson) Rate Case." *Id.* On September 29, 2021, ALJ Hoyer entered an order denying Culbertson's motion and closing the record. *Id.*

On October 12, 2021, ALJ Hoyer issued his Recommended Decision, in which he recommended approving the Joint Petition, without modification, finding Joint Petitioners' proposed settlement "is in the public interest, consistent with the Code, and is supported by substantial evidence." *Id.* at 340. ALJ Hoyer "reasoned that Joint Petitioners represent many interests," including "the public interest, the interests of residential customers, and the interest of small business customers," and that "to reach a settlement of all issues with the Joint Petitioners in a base rate case is unusual, and the resulting Settlement represents hours of negotiation and a great deal of cooperation." *Id.* at 341. Thus, ALJ Hoyer "concluded that the Settlement addresses every contested issue in this proceeding, and since all of the diverse interests represented by the Joint Petitioners have been satisfied, the Settlement benefits Columbia's customers and saves the parties and the Commission the time and expense[10] of fully litigating this matter." *Id.*

ALJ Hoyer also expressly considered and rejected Culbertson's arguments. Culbertson first argued the Commission did not investigate Columbia's requested rate increase to determine its reasonableness. R.R. at 341. Noting the extensive discovery conducted by Columbia and Joint Petitioners,[11] ALJ Hoyer rejected this argument. *Id.* at 341-42. Culbertson's second argument was the Settlement provided no reasonable assurance that the agreed upon rates were just, reasonable, and lawful. *Id.* at 342. Culbertson's third argument was Columbia's audits, internal controls, rates, rate base, and safety records were inadequate. ALJ Hoyer determined Culbertson failed to support his second and third arguments with substantial

---

[10] The expense of litigating a rate case is "an expense ultimately recovered through rates paid by customers." R.R. at 361.

[11] In its Statement in Support of the Joint Petition, Columbia asserted that it responded to over 800 formal discovery requests. R.R. at 339.

5

evidence.[12]  Finally, ALJ Hoyer rejected the remainder of Culbertson's arguments and determined Culbertson "failed to prove with substantial evidence that Columbia violated the Code, the Commission's Regulations or Orders, or Columbia's Commission-approved tariff." *Id.* at 343.

On October 20, 2021, Culbertson filed six exceptions to ALJ Hoyer's Recommended Decision.  R.R. at 344-70.  On December 16, 2021, the Commission issued a final order in this matter, denying Culbertson's first five exceptions.  The Commission granted Culbertson's sixth exception, wherein Culbertson objected to ALJ Hoyer's statement that "[t]he primary issue underlying Mr. Culbertson's Complaint in this proceeding is his belief that Columbia improperly disconnected an inactive service line at [his property] and subsequently required Mr. Culbertson to replace the customer-owned portion of the service line before restoring service." *Id.* at 370-71.  In granting Culbertson's sixth exception, the Commission noted Culbertson's rate complaint was separate from his inactive service line complaint. *Id.* at 372.  The Commission, however, viewed ALJ Hoyer's statement as dicta, "as it does not form a basis for [his] decision to dismiss Mr. Culbertson's Rate Complaint." *Id.*  As a result, the Commission determined it did not need to further modify ALJ Hoyer's Recommended Decision. *Id.*

The Commission noted the proposed settlement terms represented a nearly 40% reduction in revenue increases from the amount Columbia originally requested in Supplement No. 325.  R.R. at 372.  In addition, the Commission noted many of the settlement terms "take[] rate affordability into account to better match

---

[12] Culbertson, as the proponent of an order from the Commission, bore the burden of proof, which required him to prove entitlement to relief by a preponderance of the evidence. *See* 66 Pa.C.S. § 332(a); *Samuel J. Lansberry, Inc. v. Pa. Pub. Util. Comm'n*, 578 A.2d 600, 602 (Pa. Cmwlth. 1990).

6

households in need with available assistance," and "are beneficial to [Columbia's] customers and the public." *Id.* at 373. Finally, the Commission determined the proposed settlement "will result in significant savings of time and expenses for all Parties involved" by avoiding protracted litigation and will provide "regulatory certainty with respect to the disposition of the issues." *Id.* at 374. Accordingly, the Commission concluded that the proposed settlement "balances the concerns of all Parties involved, is in the public interest, and should be approved without modification." *Id.* at 372.

The Commission ultimately entered an order approving the Joint Petition in its entirety, adopting ALJ Hoyer's Recommended Decision, and dismissing Culbertson's and Lamb's Complaints. Culbertson filed a Petition for Review in this Court. Culbertson's arguments on appeal revolve around three main areas of perceived misconduct.[13] First, Culbertson asserts the Commission should have conducted an audit of Columbia in accordance with various auditing and accounting standards. Second, Culbertson asserts the Commission violated his constitutional due process rights. Third, Culbertson asserts the Commission's approval of a "black box" settlement was illegal. As a result of these three main alleged errors, Culbertson asserts Columbia's rates are not just and reasonable.

---

[13] Culbertson included 17 numbered paragraphs alleging errors, which spanned 8 pages, in his Petition for Review. *See* Petition for Review. Culbertson's "Statement of Questions Involved" section of his Brief, however, only included four questions. *See* Petitioner's Br., at 7. Although the Argument section of Culbertson's Brief purports to be divided into four sections to correspond with his Statement of Questions Involved, Culbertson's Argument section is repetitive and disorganized. *See generally* Petitioner's Br. It is not our position, nor function, to advance the arguments of a party before us. Keeping in mind that Culbertson is a pro se petitioner, however, we have attempted to consider the substantive merits of each argument he developed in his Brief. *See Muretic v. Workers' Comp. Appeal Bd. (Dep't of Lab. & Indus.)*, 934 A.2d 752, 758 (Pa. Cmwlth. 2007) (issues that are not addressed either in the statement of questions involved or argument section of the petitioner's brief are waived).

## II.    Analysis

In reviewing an order of the Commission, we are limited to determining whether substantial evidence supports the Commission's findings of fact or whether the Commission committed an error of law, violated a party's constitutional rights, or violated its own procedures. *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006) (*Popowsky II*); *see also* 2 Pa.C.S. § 704.    We defer to the Commission's interpretation of the Code and its own regulations unless the Commission's interpretation is clearly erroneous. *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1203 (Pa. 1997) (*Popowsky I*).  In addition, we may not substitute our judgment for the Commission's judgment "when substantial evidence supports the [Commission's] decision on a matter within the [C]ommission's expertise." *Id.* at 1201.  Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Phila. Gas Works v. Pa. Pub. Util. Comm'n*, 898 A.2d 671, 675 n.9 (Pa. Cmwlth. 2006) (citation omitted).

The Code requires that "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable, and in conformity with regulations or orders of the [C]ommission." 66 Pa.C.S. § 1301(a).  If a public utility desires to increase its rates, it must first provide the Commission with 60 days' notice of the proposed changes. *See* 66 Pa.C.S. § 1308(a).  The Commission may then, upon the filing of a third-party complaint or upon its own motion, conduct a hearing to determine "the lawfulness of such rate." 66 Pa.C.S. § 1308(b).  When a public utility requests a general rate increase, the Commission must also "promptly enter into an investigation and analysis" of the proposed rates. 66 Pa.C.S. § 1308(d).  While the Commission proceeds with an investigation and a hearing, it may suspend the

proposed rate increase for six months, plus an additional period of three months, while a decision is pending. 66 Pa.C.S. § 1308(b).

If the Commission determines the proposed rates are "unjust or unreasonable, or in anywise in violation of the law," the Commission must "determine the just and reasonable rate to be charged or applied by the public utility for the service in question, and shall fix the same by order to be served upon the public utility." 66 Pa.C.S. § 1308(c). In general rate cases, following an investigation and hearing, the Commission must enter "a final decision and order, setting forth its reasons therefor, granting or denying, in whole or in part, the general rate increase requested." *Id.*

At a hearing before the Commission, the proponent of an order carries the burden of proof. 66 Pa.C.S. § 332(a). That party "must prove its case by a preponderance of the evidence, which is evidence more convincing than that offered by the other parties." *Transource Pa., LLC v. Pa. Pub. Util. Comm'n*, 278 A.3d 942, 955 (Pa. Cmwlth. 2022) (citing *Se-Ling Hosiery, Inc. v. Margulies*, 70 A.2d 854, 855-56 (Pa. 1950)). The proponent's burden of proof includes a burden of production and a burden of persuasion. *Transource Pa.*, 278 A.3d at 955 (citation omitted). "[T]he burden of persuasion never leaves the party on whom it is originally cast, but the burden of production may shift during the course of the proceedings." *Riedel v. Cnty. of Allegheny*, 633 A.2d 1325, 1328 n.11 (Pa. Cmwlth. 1993).

### A. Auditing

Culbertson first argues the Commission failed to investigate this matter and assure Columbia's rates were just and reasonable because it did not conduct an audit of Columbia in accordance with various accounting principles. *See* Petitioner's Br. at 31-34. Specifically, Culbertson takes issue with Columbia's inclusion of costs for its accelerated pipeline replacement program in its rate base filing. *See id.* at 36.

9

Culbertson asserts that "[i]ncluding accelerated costs pad the rate base" and violate the "GAO Yellow Book."[14] *Id.* Culbertson also argues the Commission should have audited Columbia in accordance with article VIII, section 10 of the Pennsylvania Constitution, Pa. Const. art. VIII, § 10.[15]

Culbertson did not provide any authority for his belief the Commission is required to conduct audits in accordance with the GAO Yellow Book. The Commission's auditing responsibilities are set forth in Section 516 of the Code. *See* 66 Pa.C.S. § 516. Notably, neither Section 516 nor any other provision of the Code requires the Commission to conduct audits in accordance with the GAO Yellow Book. *Id.* Because Culbertson did not provide any authority, beyond reference to the GAO Yellow Book, to support his belief that inclusion of accelerated pipeline replacement costs was improper, we agree with the Commission's determination that Culbertson did not support his argument. *See Commonwealth v. Brown*, 196 A.3d 130, 185 n.21 (Pa. 2018) ("appellate courts are 'neither obligated, nor even particularly equipped, to develop an argument for a party. To do so places the Court in the conflicting roles of advocate and neutral arbiter.'").

---

[14] United States Government Accountability Office, Comptroller General of the United States, *Government Auditing Standards*, 2021.

[15] Article VIII, section 10 of the Pennsylvania Constitution provides:

> The financial affairs of **any entity funded or financially aided by the Commonwealth**, and all departments, boards, commissions, agencies, instrumentalities, authorities and institutions of the Commonwealth, shall be subject to audits made in accordance with generally accepted auditing standards.

> Any Commonwealth officer whose approval is necessary for any transaction relative to the financial affairs of the Commonwealth shall not be charged with the function of auditing that transaction after its occurrence.

Pa. Const. art. VIII, § 10 (emphasis added).

Additionally, Columbia is a corporation whose affairs are regulated by the Commission. As the Commission properly noted, "[w]hile the Commission determines just and reasonable rates pursuant to Chapter 13 of the Code, rates are paid by ratepayers, the consumers of the utility services, not the Commission, rendering a constitutional provision calling for audits of entities funded or aided by the Commonwealth inapplicable." R.R. at 358 n.14. We agree with the Commission that the auditing requirements of article VIII, section 10 of the Pennsylvania Constitution do not apply to Columbia. Accordingly, we conclude the Commission did not err in determining Culbertson failed to show the Commission did not properly investigate or audit Columbia.

## B. Due Process

Culbertson next argues the Commission violated his constitutional due process rights. To support this argument, Culbertson asserts the Commission's administrative law judges are not impartial decision makers and the Commission is corrupt because it can receive increased revenue when utility rates increase.[16] *See* Petitioner's Br. at 35. Culbertson also asserts ALJ Hoyer should not have been responsible for investigating Columbia's proposed rate increase and for determining if Columbia's proposed rates were just and reasonable. *See* Petitioner's Br. at 31.

We begin by dispelling Culbertson's belief that ALJ Hoyer was responsible for investigating Columbia's proposed rate increase. After the Commission issued its May 6, 2021 order instituting an investigation, I&E entered its appearance in this

---

[16] "The [Commission] is funded by assessment of the regulated public utilities throughout the state. Subject to budget approval, the [Commission] assesses utilities up to three-tenths of one percent of gross intrastate revenue to cover the cost of regulation. All assessments are paid into the General Fund of the State Treasury through the Department of Revenue for use solely by the Commission." Pennsylvania Public Utility Commission, *About the PUC*, https://www.puc.pa.gov/about-the-puc/ (last visited August 16, 2023).

11

matter. I&E, as a party to the proceedings before ALJ Hoyer, was the Commission's entity charged with investigating Columbia's proposed rate increase. Contrary to Culbertson's assertion, ALJ Hoyer was not "ordered or expected to do an investigation of the proposed and existing rates." *See* Petitioner's Br. at 31. Instead, ALJ Hoyer presided over this matter, received evidence, and issued a Recommended Decision.

Regarding Culbertson's assertion the Commission violated his due process rights because ALJ Hoyer was not an independent decision maker, we note that the essential elements of due process are notice and an opportunity to be heard in a full and fair hearing before an impartial decision maker. *See Abramovich v. Pa. Liquor Control Bd.*, 416 A.2d 474, 476 (Pa. 1980). The Pennsylvania Supreme Court considered the independence, or lack thereof, of an agency's adjudicatory body in *Lyness v. State Board of Medicine*, 605 A.2d 1204 (Pa. 1992). In *Lyness*, the State Board of Medical Education and Licensure (Board of Medicine), acting on information its own prosecuting attorney provided, determined sufficient evidence existed to initiate disciplinary action against a doctor. *Id.* at 1205. Following a formal hearing, a neutral hearing examiner suspended the doctor's license for a period of five years. *Id.* at 1205-06. After the doctor and the Board of Medicine's prosecuting attorney appealed, the Board of Medicine conducted a *de novo* review and ordered the permanent revocation of the doctor's license to practice medicine and surgery in the Commonwealth. *Id.* at 1206. The Court held that the Board of Medicine's actions were "an unconstitutional intermingling of the prosecutorial and adjudicatory functions," noting due process requires that "if more than one function is reposed in a single administrative entity, walls of division [must] be constructed which eliminate the threat or appearance of bias." *Id*. at 1209-10.

In *Office of Disciplinary Counsel v. Duffield*, 644 A.2d 1186, 1188 (Pa. 1994), an attorney, relying on *Lyness*, argued that the Disciplinary Board violated his due process rights because it controlled the entire prosecution and adjudication of his charges. *Id.* In *Duffield*, the Court noted that although a member of the Disciplinary Board reviews and approves the Office of Disciplinary Counsel's decision to file formal charges, that board member has no further involvement in the case. *Id.* The Secretary of the Disciplinary Board assigns cases to a Hearing Committee, on a rotating basis, which acts as a trial court, and the Disciplinary Board then reviews the Hearing Committee's actions on a *de novo* basis. *Id.* The Supreme Court determined this procedure did not violate the attorney's due process rights because the Disciplinary Board did not commingle prosecutorial and adjudicative functions. *Id.*

In *Quigley v. Unemployment Compensation Board of Review*, 263 A.3d 574, 585-86, 588 (Pa. 2021), a claimant argued that the Unemployment Compensation Board of Review (UC Board) violated her due process rights by raising legal issues *sua sponte*, thereby assuming a prosecutorial role. In rejecting this argument, the Court noted the UC Board "was not involved at all in the administrative decision-making process involving [the claimant] until she lodged her appeal from the referee's decision." *Id.* at 594 n.13.

In this matter, the Commission responded to numerous parties' petitions opposing Columbia's proposed rate increase by instituting an investigation and assigning this case to its Office of the Administrative Law Judge to hear evidence and propose a resolution. I&E, which is a separate bureau within the Commission, investigated Columbia's proposed rates, intervened as a party in opposition to Columbia's original proposal, and ultimately joined in seeking a settlement. The

13

Commission issued its decision after reviewing the evidence and ALJ Hoyer's proposed resolution. Neither ALJ Hoyer nor the Commission participated in instituting or prosecuting this matter. Thus, like the Disciplinary Board in *Duffield* and the UC Board in *Quigley*, the Commission did not violate Culbertson's due process rights by commingling prosecutorial and adjudicative functions.

With regard to Culbertson's argument the Commission is corrupt because its revenue can increase when utility rates increase, we conclude Culbertson has failed to produce any evidence that would show the Commission's decision-making was the product of bias or partiality in this matter. The Commission's regulations provide that "[i]t is the policy of the Commission to encourage settlements." 52 Pa. Code § 5.231. The Commission's regulations also state "[i]n the Commission's judgment, the results achieved from a negotiated settlement or stipulation, or both, in which the interested parties have had an opportunity to participate are often preferable to those achieved at the conclusion of a fully litigated proceeding." 52 Pa. Code § 69.401. For this reason, the Commission established "guidelines and procedures designed to encourage full and partial settlements as well as stipulations in major section 1308(d) general rate increase cases." *Id.*; *see also* 52 Pa. Code §§ 69.402 – 69.406.

The record reflects that the Commission did not consider its own revenue when it decided to accept the parties' proposed settlement. Joint Petitioners, some of whom are statutorily required to represent the interests of residential and small business customers, presented a proposed settlement to the Commission after conducting an extensive investigation into Columbia's proposed rate increases. In reviewing and recommending approval of the proposed settlement, ALJ Hoyer noted that it was rare for the parties to a rate case to reach a settlement on all issues. *See*

14

R.R. at 341. In deciding to accept ALJ Hoyer's recommendation and approve the proposed settlement, the Commission noted

> the Settlement referred to the Parties' substantial collective investigation through formal and informal discovery and the resulting evidentiary record consisting of multiple statements of direct, rebuttal, surrebuttal, and rejoinder testimony, and the conduct of multiple settlement discussions that culminated in an agreement to an overall rate increase, an allocation of the increase among the rate classes, and a rate design among and within the rate classes. . . . The Joint Petition was signed by all Parties to the litigation except two individual Complainants, one of whom, Mr. Culbertson, continued his litigation. The Settlement was also supported by nine Statements in Support representing ten parties, each of which addressed multiple issues and justified the settlement resolution.

R.R. at 359-60. Accordingly, we reject Culbertson's assertion the Commission's approval of the Settlement in this matter was a product of corruption.

### C. Black Box Settlements

Culbertson's final argument is that the Commission's approval of a "black box" settlement was illegal. Culbertson referred to "black box" settlements as settlements where "documents that should or could have been relied upon are in a black box," and asserted they are "not subject to reason nor transparent." *See* Petitioner's Br. at 18, 37. Thus, Culbertson asserts approving a black box settlement circumvents the Commission's responsibility to conduct comprehensive audits. *See id.* at 36. Culbertson also asserts black box settlements violate Section 335(d) of the Code in that materials relied upon by the Commission in entering into the settlements are required to be publicly available. *See* 66 Pa.C.S. § 335(d).

As ALJ Hoyer and the Commission explained, a "black box" settlement is not a settlement where the supporting documentation is not released to the public. *See* R.R. at 213, 328. Instead, most of the evidence in this case, including the Joint

Petition, is publicly available. *Id.* at 366. As ALJ Hoyer explained, a "black box" settlement is a settlement where the "parties do not specifically identify revenues, expenses and return[s] that are allowed or disallowed." *Id.* at 213. The Commission explained Joint Petitioners' proposed settlement qualifies as a "black box" settlement because "the parties were not able to agree on each and every element of the revenue requirement calculation." *Id.* at 328. The Commission also explained it

> has recognized that "black box" settlements can serve an important purpose in reaching consensus in rate cases:
>
>> We have historically permitted the use of "black box" settlements as a means of promoting settlement among the parties in contentious base rate proceedings. Settlement of rate cases saves a significant amount of time and expense for customers, companies, and the Commission and often results in alternatives that may not have been realized during the litigation process. Determining a company's revenue requirement is a calculation involving many complex and interrelated adjustments that affect expenses, depreciation, rate base, taxes and the company's cost of capital. Reaching an agreement between various parties on each component of a rate increase can be difficult and impractical in many cases
>
> *Pa. [Pub. Util. Comm'n] v. Peoples TWP LLC*, Docket No. R-2013-2355886 (Order entered December 19, 2013) . . . at 28 (citations omitted).

R.R. at 328-29.

The Commission further supported its practice of accepting "black box" settlements as follows:

> [A] "black box" settlement is generally not dissimilar to settlements in general. Each party to a litigated matter ultimately finds reasons to agree to a settled conclusion of its issues and thereby to procure a

16

resolution it deems satisfies its needs, even if it is not the fully litigated position on all issues the party initially advocated. If settlements were rejected, particularly on the basis of a challenge to their descriptive name, settlements in general would become impractical because parties would not be able to agree on the specific path any settlement takes to achieve resolution.

R.R. at 363.

Regarding the "black box" settlement in this case, the Commission concluded, "based on [its] review of the record, the Joint Petition and attached supporting statements, and the ALJ's recommendation," that the proposed "black box" settlement "is in the public interest and results in just and reasonable rates, including a substantially lower rate increase than originally proposed by Columbia." R.R. at 362. "The fact that the settlement is described as a 'black box,' meaning the parties did not stipulate precisely how each arrived at its conclusion, 'does not diminish the effectiveness of the examination conducted by numerous parties having various, and in some cases antithetical, goals.'" *Id.* (citation omitted). The Commission further reasoned:

> There is no single path to just and reasonable rates. Many paths can lead to the same destination. Except for insular issues that require a specific finding, many alternative paths can lead to a finding that the Settlement produces just and reasonable rates that are in the public interest. However, it is characterized as a "black box" because unless an issue is resolved in a manner specifically prescribed in the settlement, how each party gets to its resolution is of no matter to the ultimate conclusion if it is supported by the record. We find that to be the case here. As Columbia aptly describes in its Statement in Support, the Joint Petitioners, their counsel, and experts, "have considerable experience in rate proceedings. Their knowledge, experience, and ability to evaluate the strengths and weaknesses of their litigation positions provided a strong foundation upon which to build a consensus on the settled issues. . . . The Settlement reflects a carefully balanced compromise" of each Party's interests.

17

R.R. at 362-63 (citing Columbia's Statement in Support, at 2-3).

Upon review of the record in this matter, we discern no error on the Commission's part in approving the "black box" settlement the parties proposed in the Joint Petition.

## III. Conclusion

Upon review, we reject Culbertson's arguments that the Commission violated his constitutional rights or its own procedures, committed errors of law, or reached findings that were not supported by substantial evidence. Accordingly, we affirm the Commission's order.

_____
STACY WALLACE, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

18

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard C. Culbertson,           :
             Petitioner    :
                              :
         v.                    : No. 152 C.D. 2022
                              :
Pennsylvania Public Utility        :
Commission,                   :
            Respondent : 

## **O R D E R**

**AND NOW**, this 17th day of August 2023, the December 16, 2021 order of the Pennsylvania Public Utility Commission is **AFFIRMED**.

 

_____
STACY WALLACE, Judge